PEOPLE v. MAKA.

1. CRIMINAL LAW — INDORSING WITNESS' NAME ON INFORMATION
   WITHIN COURT'S DISCRETION.
   In a prosecution for the unlawful possession and sale of
   intoxicating liquors, it was within the discretion of the
   trial court to allow the prosecutor to indorse upon the
   information the name of the deputy sheriff who arrested,
   in an intoxicated condition, a man to whom an alleged
   illegal sale had been made by defendant.

2. INTOXICATING LIQUORS—ILLEGAL SALE—PRINCIPAL AND AGENT.
   In a prosecution for the unlawful possession and sale of
   intoxicating liquors, evidence showing that defendant made
   moonshine whisky; that on the day in question, while
   he was away, he left his home in charge of his 15-year
   old son; that a purchaser came to get some whisky; that
   the son showed where it was kept; that the purchaser
   took a two-quart can of the liquor and left $3 on the
   shelf; that when defendant came home the son told him
   of the transaction and he took the money, held, sufficient
   to present to the jury the question of defendant's guilt
   under proper instructions as to the son's agency for de-
   fendant in making the sale.

Error to Ottawa; Cross (Orien S.), J.    Submitted
January 13, 1927.    (Docket No. 160.)    Decided Feb-
ruary 4, 1927.

Joseph Maka was convicted of violating the liquor
law, and sentenced to pay a fine of $500 and to im-
prisonment for not less than one nor more than two
years in the Michigan reformatory at Ionia.    Affirmed.

*John J. Smolenski*, for appellant.

*William W. Potter*, Attorney General, and *Clarence
A. Lokker*, Prosecuting Attorney, for the people.

[1]Criminal Law, 16 C. J. § 2027; [2]Intoxicating Liquors, 33 C.
J. §§ 510, 532.

STEERE, J.  Defendant was prosecuted and convicted in the circuit court of Ottawa county of violating the prohibition law under an information charging, as a second offense, that on May 15, 1926, in Robinson township, Ottawa county, he

"did then and there unlawfully sell and furnish through his agent, Alex Maka, a quantity of spirituous and intoxicating liquor, to wit: two quarts of moonshine whisky, to one Albert Ritz. For this also, to wit: that at the time and place aforesaid he, the said Joseph Maka, did then and there keep a place, to wit: his dwelling house in the said township of Robinson, where intoxicating liquor, to wit moonshine whisky, was then and there unlawfully manufactured, stored, possessed, and sold to others," etc.

Ritz testified that he had known defendant for about two years, knew where he lived and had been to his home prior to the day in question. On that day he went over there with a companion and got two quarts of moonshine whisky in defendant's house from defendant's 15-year old son, giving "three dollars for the two quarts." He told the boy he came after moonshine, and got it from a cupboard in a room north from the kitchen, leaving the three dollars on the shelf where the moonshine was taken from. He did not see or talk with defendant, who, the testimony showed, was absent from home with his wife on that day.

Defendant's 15-year old son, Alex Maka, testified that on the occasion in question he was at home with his two younger brothers, who were out of the house at the time Ritz and another man came there. Ritz told him he had seen his dad and

"followed me into the room and took it off the shelf himself.

"Q. Took what off the shelf himself?

"A. The whisky.

"Q. The whisky. And how much whisky did he take?

"A. Two-quart can.

"*Q.* What?

"*A.* Two-quart can.

"*Q.* And did he pay anything for it?

"*A.* He put three dollars on the shelf and then he went out.   My dad got the three dollars afterwards. He would find it there, that is the only way it made me think he got it.   *   *   *   I guess he got it because it was in the house."

Asked if he knew where his father got the whisky, he said:

"He must have a still but I never seen him make it. I saw it in the yard; it wasn't in plain sight."

A witness named Severance, who talked with defendant after his arrest, testified he admitted having made moonshine, and said that when he returned home he found $3 on the shelf and talked with his boy about it.

Proper proof as to this being a second offense was made by production of the records showing previous conviction for a like offense on February 8, 1923, at which time defendant pleaded guilty to the charge. No testimony was offered by the defense.   When the prosecution rested, defendant's counsel moved for a directed verdict of not guilty, which was denied.

When the case was called, the court, against defendant's objection, allowed the prosecution to indorse upon the information the name of one Bussis, a deputy sheriff, who arrested Ritz in an intoxicated condition on the day in question.   Failure to indorse his name was admittedly an oversight of the prosecutor, but it was shown that Bussis's connection with the matter was simply initiatory.   His testimony was undisputed and made no reference to defendant.   He was a veterinarian by calling and also a deputy sheriff.   Beyond those self-introductory facts, his entire testimony is as follows:

"I met Albert Ritz on or about May 15th, this year, about three miles south of Coopersville; he was in-

toxicated, I took about a quart and a half of moonshine liquor from him.    I delivered it at the sheriff's office, also delivered Mr. Ritz there."

When allowing the indorsement, the court said to defendant's counsel: "If it develops you need time to investigate, we will give you time."    Under the circumstances shown and the purpose for which this witness was called, we think it was within the discretion of the court to allow the indorsement.

Defendant's main assignments of error relate to refusal of the court to direct a verdict in his behalf because there was no proof of agency, or testimony in any way connecting him with the sale made by his 15-year old son in his absence which raised any issue for the jury, while the court erroneously instructed them as follows:

"You are instructed that an agent is one who is authorized to act for another.    If you find that Joseph Maka left his son Alex Maka at home in charge of the house while Joseph Maka was away to Coopersville, and that he sold liquor to Albert Ritz and was authorized to make sales, and that when Joseph Maka returned home he took the money that was left for the moonshine, that Alex Maka would be the agent of his father Joseph Maka."

In support of this contention defendant's counsel cites *People* v. *Murn,* 220 Mich. 555.    In that case defendant was not charged with having the liquor in his possession but with making an unlawful sale of it.    The sale was made by his wife while he was absent at work in a field.    Both he and his wife testified to no previous understanding and he knew nothing of the transaction until later.    By direction of the court the jury found him guilty of selling a quart of whisky.    This was held error, as under the testimony of defendant and his wife there was a question of fact for the jury.    Here the court left the whole question of defendant's guilt, including agency, to the jury.

Ritz and the boy were the only available witnesses to the transaction.   Their reluctant manner of testifying clearly indicates they were unwilling witnesses, who did not intend to tell more than they had to, though inadvertently did tell more than they intended to.   There was testimony defendant admitted making moonshine whisky, and that he got the money for this two-quart can of it, which was identified and traced back to a cupboard in a room at the rear of his kitchen. Its potent intoxicating properties were shown by Ritz's experience in sampling it.   When defendant left home that day he left his son in charge of the place, and a quantity of moonshine whisky in the house of which the son had familiar knowledge, as also of the fact that his father had a still somewhere outside, which "wasn't in plain sight" but he "saw it in the yard." Ritz appeared there in quest of moonshine just when defendant's oldest and nearly grown son was alone in charge of the place.   It is fairly inferable that amongst those experienced in that line of traffic few words are required to conduct such a deal.   In that transaction what was done is more significant than what was said. Certain exigencies of the prohibition law have spread the so-termed "moonshine" business from its reputed place of origin to many parts of this broad land and with it have gone certain peculiar and mysterious methods of marketing the commodity, now more or less a matter of common knowledge.   As related by Ritz and young Maka, the transaction involved here rings true to the tone of those methods.   Few were the words said but enough was said for their minds to meet.   Neither of them testified that a word was spoken by young Maka during the deal.   Ritz covered the interview by first stating that when admitted to defendant's home, where he found the boy alone, he "told him I came after moonshine," then concisely stated where and how he got it, how much and how

he paid for it. In his direct-examination by the prosecuting attorney, young Maka did not even disclose that any mention of moonshine passed between them but told that Ritz initiated its purchase by saying "he seen my dad," then followed where the boy led and "took it off the shelf himself," confirming Ritz's account of the amount and manner in which Ritz paid for it. On cross-examination by defendant's counsel, he enlarged Ritz's introductory declaration of his mission as follows:

"The first thing Ritz said was he seen my dad, near Coopersville, he said he told him he could have some liquor."

Whether he made any reply is left to inference. Though his memory tested obscure or negative on various other proper subjects of inquiry, he testified definitely that he did not personally deliver or touch the moonshine Ritz took, acknowledging, however, that he stood by and saw Ritz take it and observed that Ritz left the $3 on the shelf where the moonshine was taken from. He also testified distinctly that he neither took or touched the money, but left it just where Ritz put it in the place the moonshine was taken from, which is substantiated by proof that his father admitted he found it there on the shelf. Ritz denied telling the boy that he had seen his dad and been told by him he could have some liquor and adhered to his first account of how he introduced the subject. Under the facts shown and circumstances surrounding this transaction, considered in their entirety, the question of implied agency is fairly made an issue of fact for the jury. It was so submitted under a plain and impartial charge, in which we find no reversible error.

The conviction and judgment will stand affirmed.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.